Filed 9/8/16  In re Ernesto L. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re ERNESTO L. et al., Persons Coming Under the Juvenile Court Law. | B268184<br>(Los Angeles County<br>Super. Ct. No. CK86646) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>STEPHANIE L.,<br><br>      Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirmed.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Stephanie L. (mother) appeals from an order removing her daughter, Em. L., from parental custody under Welfare and Institutions Code section 361, subdivision (c)(1).[1] Mother contends the court's removal order was not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The family involved in this case consists of mother, father, their son Er. L. (born 1998), and their daughter Em. (born 2001). The family was the subject of an earlier dependency proceeding in 2011, based on domestic violence by father against mother, and father's abuse of alcohol and cocaine. Specifically, the earlier proceeding involved sustained allegations that the father had "a history of substance abuse including cocaine and is a current abuser of alcohol," and that he "engaged in a violent altercation in the children's presence in which the father brandished a knife and threatened to stab the mother." The petition also alleged that on prior occasions, father had pushed mother; broken her belongings; torn her clothing; and broken tables chairs, ceramics, and cabinets; and that mother failed to protect the children from father's violent actions. The referrals leading to the 2011 dependency proceeding claimed mother tried to post bail for father after father was arrested for threatening mother, and she allowed him to stay overnight at the home when he was released from jail, despite a restraining order against him. A later referral highlighted mother's tendency to minimize the family's problems despite concerns that the children were having behavioral problems due to the family's history of domestic violence. In the 2011 case, the children were removed from father and remained with mother. The court ordered father to complete a 52-week domestic violence perpetrator program, random alcohol testing, and a 12-step program. Mother was ordered to participate in family maintenance services, including a domestic violence support group, ALANON meetings, and individual counseling for mother and the

_____

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

2

children. According to a progress letter dated March 2, 2012, mother and her children attended a total of 40 individual counseling sessions, and father participated in eight family conjoint sessions. Mother had good participation in her individual domestic violence counseling and showed "devotion and concern for the well being of her children and ability to resolve family conflicts in an appropriate manner." The court terminated jurisdiction on March 14, 2012, with a "home of parent" order. It is unclear from the record in this appeal whether the court ordered the children to return to mother, father, or both.

Simultaneously with the dependency proceeding, father was placed on three years probation conditioned on service of 60 days in jail for threatening mother with a knife. The court issued a restraining order for father to stay away from mother for three years.

Mother has six sisters and one brother. According to one of mother's sisters (maternal aunt Lorraine), none of the siblings talk to mother, because of her life choices. Lorraine reports that mother and father have a long history of violence, addiction, and dysfunction. Father is a hardcore alcoholic and cocaine user who becomes violent when under the influence. Despite the incident leading to father's arrest, mother continued to violate the restraining order against father and minimized both his addiction and their cycle of violence, to the point that mother's family turned their back on her in order to set boundaries.

The family again came to the Department's attention in 2015. On May 1, 2015, Em. got into an argument with both of her parents when she refused to put on her school uniform. Mother and father tried to take Em.'s iPod away from her, with father holding her down and striking her with a hanger. Ultimately, mother took the iPod from her and broke it in front of her. Em. became upset and tried to strangle herself with earphone cords, and when her mother took the earphone cords away, she broke a light bulb and tried to cut her wrists. When her parents tried to stop her again, she faked calming down, took some glass shards to her room, and cut her wrists with the shards. Describing the incident later, Em. said she had smoked marijuana in the morning, and she was not sure if it was laced with other substances. Her plan was to meet up with her friends and skip

school.  She explained that she had been going through a difficult time and associating with a new set of acquaintances who use drugs.  Em. acknowledged using marijuana and drinking alcohol several times before, and using methamphetamine at least twice.

Mother sought assistance with Em. from maternal aunt Lorraine, who agreed Em. could stay with her over the weekend.  Em. reported to Lorraine that father continues to drink daily and becomes very demanding and aggressive towards her, while being more lenient with her older brother Er.  The following week, mother and Em. were in a pushing match in Lorraine's home, because Em. refused to go with mother.  Lorraine and mother agreed to permit Em. to stay with Lorraine until the end of the school year.

Mother took Em. to school on May 5, 2015, and informed school staff about Em.'s May 1, 2015 suicide attempt.  Although Em. was upset that mother had reported her suicide attempt, she was still feeling depressed and agreed to be hospitalized.  The psychiatric social worker who evaluated Em. noted that when she tried to talk to mother about mental health and accessing services, mother appeared to be more concerned about the Department's possible involvement, rather than Em.'s well-being.

During her May 2015 hospitalization, Em. expressed frustration over father's aggressiveness.  She reported father drank heavily and would hit her.  Em. was diagnosed with major depressive disorder, and was prescribed medication, but refused to take her medication.  Mother gave the social worker conflicting information about Em.'s medication compliance, first stating on May 15, 2015, that Em. was on one medication, and the pharmacy was waiting for a call from the psychiatrist about the second medication.  Later, on June 8, 2015, mother told the social worker the therapist had said it was up to mother if she wanted to continue medication, and that mother concluded Em. did not need medication because she was not angry anymore.  Mother subsequently testified that Em. was on medication when she was discharged from the hospital in May, but mother did not know whether Em. was on any medication since that time.

On July 2, 2015, the Department filed a petition alleging Em. and her 16-year-old brother Er. were minors falling under subdivisions (a), (b), and (j) of section 300, based on father's alcohol abuse, physical abuse by mother and father, and the parents' failure to

4

seek medical care for Em.'s mental and emotional problems. The Department sought court intervention to ensure parents continued with services, but did not seek to remove the children from the home.

In a jurisdiction and disposition report signed on July 30, 2015, the Department reported that the family was receiving services. Em. had two therapy sessions in July, and was scheduled to have weekly therapy beginning in August. Father missed a July 22, 2015 drug test. The Department acknowledged that the family had exhibited "a history of minimization of domestic violence and family problems" as evidenced by reports from the 2011 dependency case. The July 2015 report continues: "[u]ltimately, the [L.] family does not understand or even acknowledge how their dysfunctional family interactions perpetuate [Em.'s] erratic and violent behaviors and [Er.'s] apathetic depressive symptoms, [father's] ongoing addiction, and [mother's] denial of domestic violence, dependence and limited parenting skills. Despite past [Department] involvement and interventions, the [L.] family slithered out of the Dependency Court system through manipulation and regurgitation of 'lessons learned'. Years later the family is back and the consequences of their inactions and stagnation are more severe and require actual participation and acknowledgement of problems."

On August 10, 2015, father had a positive urine test for alcohol, with a alcohol level of 0.04 percent. When the social worker went to the family's home to discuss the test results, father admitted drinking two beers with his brother around 3:00 p.m. on August 9, 2015. He returned home later that day, and the family watched a movie together. Mother, Er., and Em. did not notice any differences in father's behavior, and were unaware of his drinking alcohol earlier that day. The social worker explained that father's decision to drink alcohol violated his case plan and put the children at risk of being removed. Mother directed father to leave the home immediately, because she did not want the children removed. Father left the home with some belongings and planned to stay with his brother. Em. was very sad and upset about her father leaving. The social worker asked Em. if her feelings might trigger her to hurt herself, and Em. responded she was just sad. The social worker provided mother with phone numbers for a psychiatric

5

mobile response team and told her to call the team if she needed assistance with Em., and to call 911 if she needed help immediately.

On August 16, 2015, Em. was hospitalized a second time. According to Mother, her twin sister (maternal aunt Jessica) invited the family to go to a pool at a park, but Em. was angry because she wanted to see father. Mother was able to calm her down, and the family went to the park, but Em. became angry again, and mother called the police for help. The police were able to calm her down, but they were called away on an emergency. Mother called the police again after the family had returned home and Em. threatened her brother with a knife. The police took Em. into custody, and she was placed on a 72-hour hold at Martin Luther King Mental Health Hospital. Later, she was transferred to Del Amo, an inpatient psychiatric hospital, where she remained until she was discharged into Department custody on August 24, 2015. She was initially diagnosed with disruptive mood dysregulation disorder and began taking medication. Later, her diagnosis was changed to bipolar disorder, but her medication remained the same. Em. later explained to the social worker that the incident had been taken out of proportion. She stated maternal aunt Jessica had blamed her for the family's situation, causing her to become angry. She acknowledged she grabbed a knife, but denied threatening her brother.

On August 25, 2015, Em.'s therapist told the social worker she had been seeing Em. for two months and had no concerns for the family. She said Em. displayed no symptoms of anger or depression. She acknowledged the family may have been lying, as the circumstances at home were different from what Em. reported during sessions.

While Em. was hospitalized, the Department obtained an order removing Em. from both parents, and Er. from father. Em. was placed in an out-of-county D-rate foster home.[2] A supplemental report stated Em. was doing well in her placement, but that the

_____

[2] According to information on the Department's Child Welfare Mental Health Services Division Web site, the term "D-rate" refers to a "special funding category for foster care providers who have received special training to provide care for children with

caregiver stated Em. is running out of medication, and the caregiver wants Em. in therapy because she appears sad and pensive, but refuses to talk about her issues. According to the caregiver, Em. has high blood pressure and possible diabetes. Em. wants to reunify with her family, but does not want to visit with mother.

Because Em. was placed in Riverside, it was taking additional time to access services for her. Mother and Er. were scheduled to begin individual therapy, and mother was attending parenting classes. The Department's report stated it was "extremely concerned as to [mother's] sincerity and willingness to make lifelong changes. [Mother] has shown a pattern of behavior of minimizing and/or excusing the family's dysfunctional behaviors (including but not limited to [father's] alcoholism, [Em.'s] drug usage and outbursts and [Er.'s] tendency to shut down)." The Department had been unable to locate father, and he had missed two drug tests after testing positive for alcohol on August 11, 2015. In a separate last minute information report, the Department informed the court "that mother . . . has only been enrolled in therapeutic services for less than three weeks. It is unrealistic to conclude that [mother] has developed sufficient insight and boundaries to provide child [Em.] with a safe and nurturing environment."

At the October 8, 2015 disposition hearing, the court entered the Department's reports into evidence and heard testimony from mother. When questioned about the May 2015 incident that led to Em.'s first hospitalization, mother said, "it all started with a tantrum that she didn't want to wear a school uniform." When asked what she meant by a "tantrum," mother replied, "like attitude, yelling, like crying. That's a tantrum to me." Mother testified that Em. had never had a tantrum before, and when asked whether the tantrum escalated, mother replied "She was just saying she was on drugs. That was it." Mother denied noticing any signs that Em. was on drugs before she claimed to be on drugs. Mother said she took Em.'s iPod away to stop or decrease Em.'s tantrum.

Mother also testified that when Em. was hospitalized, she learned "to get a lot of therapy for her. To get a lot of help." Mother arranged for Em.'s therapy, and she was

---

special needs due to a mental health diagnosis."
(<http://www.lacdcfs.org/katieA/D_RATE/index.html> [as of Jul. 29, 2016].)

going to counseling every two weeks. Regarding safety planning, mother was told about removing sharp objects and extension cords, and wanted to take a class to learn how to handle Em.'s tantrums, but had not found anything yet. When asked about her understanding of Em.'s diagnosis of bipolar disorder, she responded, "I really don't know what it – changing moods? Changing moods. That's what I have, from my understanding."

Mother testified that Em. had good behavior and was attending school until her father left the home after his positive alcohol test. When that happened, mother said Em. "threw another tantrum, and she wanted to go with her dad. We went to my sister Jessica's, which is my twin sister, to give us comfort. She was very bad. She wanted to see her dad very badly." When asked if she did anything to help her daughter handle the situation, mother responded: "We took her to the swimming pool. And she was just continuing that she wanted to see her dad and she wanted to see her dad and things just got worse." Asked to give examples of what she did to try to calm Em. down, she said "I tried talking to her. And she was just out of control. She was out of control. And I had to call the cops."

When asked on cross examination what she would do if Em. was returned to her custody and she had another tantrum, mother replied that she would call her therapist, who would come. Pressed about what she would do as a mother to calm her daughter down without looking outside of herself for support like her sister, the police, or Em.'s therapist, she said she would talk to Em., saying things like, "Please calm down. Please help me go through this. Let's go through this together. Let's sit down and let's talk to it. Even if she were to ignore me, let's sit down and settle things down." She acknowledged this approach had not worked in the past. From her parenting class, she hoped that her daughter would come to her instead of looking out to her friends for help.

Mother made an offer of proof that Em. would testify about her time with mother, including what programs and services she was receiving, the type of support she received from mother, how she was feeling during that time, and what services she is currently receiving and how she is currently feeling. The court denied mother's request to call Em.

8

as a witness, stating that under Evidence Code section 352, the court already had information from mother's testimony and did not want to further traumatize Em., who was already emotional while listening to mother's testimony.

During argument, mother argued the Department had not proven by clear and convincing evidence that there was no means short of removal to protect Em. Em. was placed in Riverside on August 24, 2015, and she had not received any services or programs since that time. Mother had done everything she could, and there was no information about how Em. was doing in her placement. Father's counsel also argued Em. should return home, pointing out that there was no evidence about Em.'s placement and whether she was more safe there than she would be at home. In contrast, minor's counsel argued that there was clear and convincing evidence that returning home would pose a detriment to Em.'s safety, protection, and physical and emotional well-being. Counsel acknowledged that Em. wants to return home, but pointed out that in placement she has been on medication, attending school, and has been stable. Em. was on a wait list for therapy, and her counsel believed she needed to be in therapy before returning home. Minor's counsel also argued that mother needed to learn the safety tools and mechanisms needed to care for and protect her daughter. Counsel pointed out that the Department's reports highlight mother's tendency to minimize the family's issues, and this tendency posed a risk to Em.

## DISCUSSION

Mother contends substantial evidence does not support the court's determination that removing Em. from mother's custody was necessary to protect her from a substantial risk of serious harm, and that there were no other reasonable means to protect her. We disagree, and affirm the court's removal order.

9

*Standard of review*

We review a dispositional order removing a child from a custodial parent for substantial evidence. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) In determining whether an order is supported by substantial evidence, "we look to see if substantial evidence, contradicted or uncontradicted, supports [it]. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations[.]" (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) Issues of fact and the credibility of witnesses are questions for the trial court. (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 495.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) Thus, the pertinent inquiry is whether substantial evidence supports the court's finding, not whether a contrary finding might have been made. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

*Substantial evidence supported the court's removal order*

Before a child can be removed from parental custody, the Department must prove, by clear and convincing evidence, "[t]here is or would be a substantial danger to [her] physical health, safety, protection, or physical or emotional well-being if [she] were returned home" and removal is the only reasonable means of protecting her physical health. (§ 361, subd. (c)(1).) "The elevated burden of proof for removal from the home at the disposition stage reflects the Legislature's recognition of the rights of parents to the care, custody and management of their children, and further reflects an effort to keep children in their homes where it is safe to do so." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to

10

the child.  [Citations.]'" (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)  "The court may consider a parent's past conduct as well as present circumstances.  [Citation.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 170.)  "[C]ourts have recognized that less drastic alternatives to removal may be available in a given case including returning a minor to parental custody under stringent conditions of supervision by the agency such as unannounced visits." (*In re Hailey T., supra,* 212 Cal.App.4th at p. 148.)

In this case, there was sufficient evidence that Em. faced a substantial risk harm of she were returned to mother's custody.  Mother asks this court to apply factors identified in *In re Cole C.* (2009) 174 Cal.App.4th 900, 917, and to conclude that mother's responsiveness to emerging situations, such as father's positive alcohol test and Em.'s "tantrum" in August, means that Em. can be safely returned to mother's custody.  We are unconvinced.

Here, the evidence before the court supported the conclusion that while mother may be well-intentioned, she was simply not equipped with the skills to ensure the safety of a teenager who is suffering mental illness and experimenting with drugs.  Mother testified she was told to get Em. lots of therapy, which translated into seeing a therapist twice a month.  The same therapist acknowledged that the family may have been lying to her, because she was unaware of changes in the L. household that affected Em. emotionally.  While the therapist did not mention specifics, it appears that neither Em. nor anyone else told her that father had been asked to leave the home based on a positive alcohol test, and that Em. was feeling very badly about not being able to see her father.

Given the well-documented, longstanding history of dysfunction in the family, including alcoholism, drug use, and violence, it was reasonable for the court to conclude that at the very least, mother would need more than three weeks of therapy and parenting classes to be equipped to ensure the safety of her daughter, who had been hospitalized twice.  Over the course of the hospitalizations, Em.'s diagnosis has changed from major depressive disorder to disruptive mood dysregulation disorder to bipolar disorder, but mother could not demonstrate an understanding of what ailed her daughter, or what she could do to help her daughter.  Mother's history of minimizing the effects of alcoholism

11

and domestic violence on her family compound her lack of understanding regarding her daughter's serious mental health issues. Mother's ability to maintain a safe environment for her troubled teenage daughter is questionable at best.

When all these circumstances are considered together, there is substantial evidence to support the court's determination that it was necessary to remove Em. from mother's custody and the Department had met the criteria of section 361(c)(1) or (4) by clear and convincing evidence.

## DISPOSITION

The court's order removing Em. from mother's custody is affirmed.


KRIEGLER, Acting P.J.

We concur:


BAKER, J.


RAPHAEL, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.